PRESENT: All the Justices

SARAH YANCEY MAY

v. Record No. 171708

R.A. YANCEY LUMBER
CORPORATION

OPINION BY
JUSTICE S. BERNARD GOODWYN
January 10, 2019

FROM THE CIRCUIT COURT OF ALBEMARLE COUNTY
Cheryl V. Higgins, Judge

In this appeal, we consider whether the circuit court erred when it sustained a special plea in bar and entered judgment in favor of a corporation based on the circuit court's interpretation of Code § 13.1-724.

BACKGROUND

R.A. Yancey Lumber Corporation (Corporation) has been a Virginia corporation since 1959. The Corporation has two principal businesses: its mill business (Mill Business) and its timber property (Timber Business).

Through the Mill Business, the Corporation owns and operates a saw mill and lumber yard in Yancey Mills, Virginia, and "purchases loblolly and short leaf pine logs from third parties, and saws the logs into lumber, dries it in dry kilns and planes it for a finished product." Through the Timber Business, the Corporation owns about 2,500 acres of land in Albemarle, Nelson, Louisa, and Greene Counties, from which the Corporation periodically sells timber to third parties. None of the Corporation's employees or machinery are solely dedicated to the Timber Business.

As of August 2017, the Mill Business had a total assessed fair market value of $2,738,400, and assessed land use value of $3,694,500. The Mill Business is not profitable

every year, and uses the Timber Business to secure its credit line to help support its operation during those unprofitable years.

The Timber Business had a fair market value of $7,639,500 and land-use value of $1,631,600 as of August 2017. In 2016, the Timber Business generated $286,535 in revenue, which represents 1.5% of the Corporation's $18,545,666 total revenue—the Timber Business's highest percentage of the Corporation's total revenue since 2012.

Dick Yancey (Dick), Dan Yancey (Dan), and Sarah Yancey May (Sarah) are siblings and the Corporation's only directors (Board). The siblings, Dick and Dan's spouses, and Sarah's ex-spouse are the Corporation's only six shareholders. Each couple owns about one-third of the Corporation's shares, but Dick, Dan, and their spouses do not collectively own "more than two-thirds" of the total shares. Sarah and her ex-husband Bill May (Bill) own a fraction more than one-third of the total shares.

In 2015, Dick and Dan knew that Sarah did not want to sell the Mill Business, so they discussed how to structure something so that they could sell the Mill Business without Sarah's approval. Dick and Dan decided to use Article X of the Corporation's bylaws, which permits amendment to the bylaws by majority vote of the Board or shareholders.

On November 11, 2015, the Board approved an amendment (Amendment 1) to Article XII of the Corporation's bylaws by a vote of two to one, with Sarah being the director in opposition. Amendment 1 revised Article XII of the Corporation's bylaws to state:

> Notwithstanding anything herein or any non-mandatory provisions of the [Virginia Stock Corporation Act] to the contrary, either the Mill Business or the Timber Business alone, without the other or any other business activity, shall constitute a significant continuing business activity in the event such business is retained by the Corporation following the sale, lease, exchange or other disposition of the Corporation's other assets if the fair market value of the retained business assets constitutes at least twenty-five percent (25%) of the fair market value of all of the Corporation's assets in the aggregate prior to such sale,

2

lease, exchange or other disposition, excluding for all purposes hereunder cash and cash equivalents. For purposes hereunder, the most recent assessed value for local tax purposes of real property owned by the Corporation shall be considered its fair market value, absent the existence of a fair market value determination by a qualified real estate appraiser made within one year prior to the relevant determination date, in which case the most recent of such determinations shall be used to establish fair market value. This Article XII is intended to operate in lieu of the definition of "significant continuing business activity" set forth in Section 13.1-724(A) of the Code of Virginia (which statutory definition is provided for use in the absence of a defined term in the applicable articles of incorporation or bylaws).

On December 16, 2015, the shareholders approved Amendment 1 by majority vote, with Bill and Sarah as the only shareholders in opposition.

By letter dated January 29, 2016, Sarah informed the Corporation that she was "opposed to the amendment to Article XII" because it represented "a misconstruction of Virginia Code § 13.1-724 and an obvious attempt to circumvent the protection afforded to minority shareholders" by that statute.

At a January 29, 2016 Board meeting, Dick's attorney "raised concerns about the phrasing of the third sentence of Article XII . . . due to the phraseology used on county real estate tax bills," and proposed another amendment to Article XII to resolve that issue (Amendment 2). Amendment 2 only changed "the third sentence of Article XII" as noted here:

> For purposes hereunder, the most recent ~~assessed value~~ gross land and improvement values determined by local tax authority for local ~~tax purposes~~ taxation of real property owned by the Corporation, irrespective of any land use deferral, shall be considered ~~its~~ such real estate's fair market value, absent the existence of a fair market value determination by a qualified real estate appraiser made within one year prior to the relevant determination date, in which case the most recent of such determinations shall be used to establish fair market value.

The Board, with the exception of Sarah, approved Amendment 2. On March 25, 2016, all of the shareholders except Sarah, who abstained, voted to approve Amendment 2.

3

On May 3, 2017, the Corporation—pursuant to the direction of a majority of the Board—executed a letter of intent (LOI) to sell the assets of the Mill Business to a third party buyer for $10 million (Proposed Sale). Sarah called the buyer and told it that she objected to the sale. The buyer then asked for a $250,000 break-up fee if the Proposed Sale did not close. "Over [Sarah's] objection, the LOI was amended [by the Board] on June 21, 2017 to include a 'breakup fee' of up to $250,000."

On July 18, 2017, Sarah, through counsel, notified the Corporation of her objections to the LOI and Proposed Sale, warning that she would "challenge legally if necessary." On August 7, 2017, Sarah, through counsel, notified the Corporation of her intent to bring a legal action to enjoin the Proposed Sale.

On August 11, 2017, Sarah filed a complaint in the Circuit Court of Albemarle County seeking a declaratory judgment that Amendments 1 and 2, the approval of the Proposed Sale, and the execution and amendment of the LOI "are null and void." She asserted that these actions violate Code § 13.1-724, which requires more than two-thirds shareholder approval for a disposition of corporate assets that leaves a corporation without a significant continuing business. She also sought a "preliminary injunction" to "preserve the status quo" pending the outcome of the action, and a permanent injunction enjoining the Proposed Sale. On the same day as the complaint's filing, Sarah filed an emergency motion for temporary injunctive relief "to stop the [Proposed Sale] until the [circuit court] can address the merits of the Complaint."

After Sarah filed the complaint, the Board approved the Proposed Sale on August 24, 2017 by majority vote, with Sarah objecting. The shareholders subsequently considered the Proposed Sale. On September 11, 2017, Dick and Dan and their spouses voted to approve the Proposed Sale, while Sarah and Bill voted against it.

4

The Corporation responded to Sarah's circuit court complaint by filing an answer, demurrer, and special plea in bar on September 5, 2017.  In the Corporation's plea in bar, it argued that Sarah's case should be dismissed because the Proposed Sale left the Corporation with the Timber Business, which is a "significant continuing business activity" under Code § 13.1-724 because of the terms of the Corporation's amended bylaws, so Sarah's "consent is not required" for the sale of the Mill Business.  It also argued that Sarah's "claims are barred by the doctrines of laches and unclean hands."

The circuit court held a hearing on the plea in bar and emergency motion on September 15, 2017.  At the hearing, Sarah testified that income from the Timber Business was not consistent and "hasn't been significant."  She also claimed that Amendment 1 was a "blatant attempt" by Dick and Dan to eliminate the two-thirds shareholder approval required by Code § 13.1-724 regarding the disposition of the Mill Business.  She further stated that Amendment 2 was presented as a clarification of the "assessed value versus the land use value," and not as a ratification of Amendment 1.

Sarah additionally testified that she did not file the lawsuit earlier because she "thought [she] had the two-thirds vote" requirement in her favor and that the buyer's $250,000 break-up fee would "scare away Dick and Dan."  She said she would suffer irreparable harm from the Proposed Sale because "the business has been part of [her] family" and "the price is not fair."

Bill testified that he always opposed the Proposed Sale, and that he expressed this opposition to the Proposed Sale to Dick and Dan.  Bill also stated that he understood Amendment 1 as a step towards selling the Mill Business.  He testified that he asked the Corporation's counsel whether Amendment 2 was just a "housekeeping amendment."  Counsel

5

responded affirmatively, and Bill believed that he was just voting for "how to value the land" when he voted for Amendment 2.

Dan testified that he believed the value of the Mill and Timber Businesses were equivalent, and always considered the Timber Business a significant part of the Corporation. Dan admitted, however, that the Timber Business only represented 1.5% of the Corporation's revenues in 2016, and that 1.5% is "not that significant."

The circuit court explained its ruling to the parties at a hearing on September 21, 2017. In interpreting Code § 13.1-724, the circuit court acknowledged that the second sentence of Code § 13.1-724 contains a safe harbor provision that provides a threshold definition of a "significant continuing business activity," but concluded that it also allows a corporation's "bylaws or articles of incorporation [to] define that [threshold] provision differently." Noting that the statute does not require "more than two-thirds" vote to amend a bylaw, the circuit court concluded that the amended bylaw was valid and, according to Article XII's definition, the Timber Business, which would remain after the Proposed Sale, was a "significant continuing business activity." Thus, "the sale of the [Mill Business] does not require additional shareholder approval."

The circuit court also stated:

I understand that there is an argument tha[t] if the [c]ourt follows the interpretation that I am following, the corporations will create their own safe harbor provisions and gut the statute. To a certain extent the [c]ourt's interpretation does open the door for unscrupulous businesspeople to take potential advantage. However, the [c]ourt would note that the law has stated that corporate officers and directors have a fiduciary duty in dealing with shareholders which require exercising good faith in such dealings.

On the laches argument, the court also found in favor of the Corporation. Although Sarah filed her injunction one month before the shareholder vote on the Proposed Sale, the court found that Sarah knew of Dick and Dan's intentions behind the bylaw amendment as early as

6

December 2015, but took no action. The circuit court understood that Sarah "may not have wanted to incur legal fees if the sale was not going forward, but even if that is her analysis, the [c]ourt finds that her willingness to wait, when the [c]ourt is looking at a preliminary injunction, weighs in favor of [the Corporation]."

The circuit court found that enjoining the Proposed Sale would result in prejudice to the Corporation because it began soliciting offers in July 2015 and that "it is not a simple process to find a buyer for a sawmill." The court denied "the preliminary injunction, finding the equities way [sic] on the merits of the case and on the doctrine of laches in favor of [the Corporation]."

On September 27, 2017, the circuit court entered an order denying Sarah's emergency motion for an injunction, denying the demurrer, granting the plea in bar, and entering judgment in favor of the Corporation.

Sarah appeals. This Court has granted four assignments of error:

1. The trial court erred in granting the Company's Special Plea in Bar and entering judgment against Sarah on the ground that the Proposed Transaction was not approved by the affirmative vote of more than two-thirds of the Company's shares as required by Va. Code § 13.1-724, nor does it satisfy the criteria of the safe harbor set forth in Va. Code § 13.1-724(A).

2. The trial court erred in granting the Company's Special Plea in Bar and entering judgment against Sarah on the ground that a mere majority of the Company's shareholders may not amend or redefine the statutory safe harbor of Va. Code §13.1-724, nor create its own safe harbor, through the amendment of the Company's bylaws.

3. The trial court erred in granting the Company's Special Plea in Bar and entering judgment against Sarah on the ground that the general fiduciary duty owed by corporate directors and officers as recognized in Virginia caselaw, does not justify and is not a substitute for the protection to minority shareholders afforded by Va. Code §13.1-724.

4. The trial court erred in denying Sarah's Motion for Emergency Injunctive Relief on the ground that it is based on its misinterpretation of Va. Code § 13.1-724 and the erroneous finding of laches which is not supported by the evidence.

7

Sarah argues that the circuit court erred in entering judgment against her because Code § 13.1-724(A) requires approval by the shareholders if a disposition would leave the Corporation without a significant continuing business activity, and Code § 13.1-724(E) requires that such dispositions must be authorized by "an affirmative vote of more than two-thirds of the corporation's shareholders." She contends that the circuit court erred in determining that Code § 13.1-724 allows a majority of shareholders to obviate the need for shareholder approval of a disposition, as required by Code § 13.1-724(E), by redefining the safe harbor threshold stated in Code § 13.1-724(A) by a majority vote on a corporate bylaw amendment. Sarah asserts that the circuit court's interpretation of Code § 13.1-724 leads to a result contrary to the intent to protect minority shareholders expressed in the plain language of the statute. She also argues that the circuit court erred in denying her request for a temporary injunction because the circuit court based its denial on its misinterpretation of Code § 13.1-724 and upon laches which is not applicable in this instance.

The Corporation argues that the phrase, "unless the articles of incorporation or a shareholder-approved bylaw otherwise provide" in the safe harbor provision of Code § 13.1-724(A), offers corporations a mechanism to use to redefine "significant continuing business activity." The Corporation also asserts that "shareholder-approved," as stated in the phrase, refers to a majority of shareholders—otherwise the General Assembly would have explicitly provided a "more than two-thirds" threshold. It further asserts that this interpretation is consistent with Virginia's approach to flexible corporate governance. The Corporation also contends, alternatively, that it achieved the "more than two-thirds" of the votes required for

8

Amendment 1 because Bill's vote for Amendment 2 constituted approval of Amendment 1, which defined "significant continuing business activity."

The Corporation also argues that the circuit court did not abuse its discretion in denying the injunction based upon the court's interpretation of Code § 13.1-724 and the application of laches because Sarah lacked diligence in bringing her claim by waiting 20 months before filing the complaint on the "eve" of the Proposed Sale. It asserts that Sarah's intent was to scare away the buyer, which prejudiced the Corporation, and thus the equities did not favor her.

*Statutory Interpretation of Code § 13.1-724*

"[A]n issue of statutory interpretation is a pure question of law" which this Court reviews de novo. *Conyers v. Martial Arts World of Richmond, Inc.*, 273 Va. 96, 104 (2007).

"When the language of a statute is unambiguous, we are bound by the plain meaning of that language. And if the language of the statute is subject to more than one interpretation, [this Court] must apply the interpretation that will carry out the legislative intent behind the statute." *Cuccinelli v. Rector & Visitors of the Univ. of Va.*, 283 Va. 420, 425 (2012) (citations and internal quotation marks omitted).

To ascertain its plain meaning, this Court evaluates a statute in its entirety "to place its terms in context" in order to "interpret the several parts of a statute as a consistent and harmonious whole so as to effectuate the legislative goal." *Id.* (citations and internal quotation marks omitted); *see also Chesapeake & Ohio R.R. v. Hewin*, 152 Va. 649, 653-54 (1929) ("It is one of the fundamental rules of construction of statutes that the intention of the legislature is to be gathered from a view of the whole and every part of the statute taken and compared together, giving to every word and every part of the statute, if possible, its due effect and meaning." (citation and internal quotation marks omitted)). This Court "presume[s] that every part of a

9

statute has some effect, and [] will not consider any portion meaningless unless absolutely necessary." *Logan v. City Council*, 275 Va. 483, 493 (2008).

Article 13 of the Virginia Stock Corporation Act (Act) regulates the sale and disposition of corporate assets, and divides those dispositions into two groups: (1) those that do not require shareholder approval, and (2) those that require a specific threshold of shareholder approval. *See* Code §§ 13.1-723; -724.

Dispositions conducted "in the usual and regular course of business" do not require shareholder approval, "[u]nless the articles of incorporation otherwise provide." Code § 13.1-723.

By contrast, under Code § 13.1-724, certain dispositions do require shareholder approval:

> A. A sale, lease, exchange or other disposition of the corporation's assets, other than a disposition described in § 13.1-723, *requires approval of the corporation's shareholders if the disposition would leave the corporation without a significant continuing business activity. Unless the articles of incorporation or a shareholder-approved bylaw otherwise provide*, if a corporation retains a business activity that represented at least 20 percent of total assets at the end of the most recently completed fiscal year, and 20 percent of either (i) income from continuing operations before taxes or (ii) revenues from continuing operations for that fiscal year, in each case of the corporation and any of its subsidiaries that are consolidated for purposes of federal income taxes, *the corporation will conclusively be deemed to have retained a significant continuing business activity.*
>
> . . . .
>
> E. Unless the board of directors, acting pursuant to subsection C, requires a greater vote, *the disposition to be authorized shall be approved by the holders of more than two-thirds of all the votes entitled to be cast on the disposition.* The articles of incorporation may provide for a greater or lesser vote than that provided for in this subsection or a vote by separate voting groups so long as the vote provided for is not less than a majority of all the votes cast on the disposition by each voting group entitled to vote on the disposition at a meeting at which a quorum of the voting group exists.

(Emphases added.)

10

Here, under the plain meaning of Code §§ 13.1-724(A) and (E), dispositions that leave a corporation without a "significant continuing business activity" require "more than two-thirds" shareholder approval. The first sentence of subsection (A) requires shareholder approval for such dispositions, and subsection (E) specifies that such approval "by the holders" requires "more than two-thirds of all the votes" entitled to be cast. Accordingly, the supermajority voting threshold of subsection (E) applies to any disposition that leaves a corporation without a "significant continuing business activity." The apparent purpose of the statute is to protect minority shareholders.

Code § 13.1-724 does not define "significant continuing business activity." It does, however, provide a safe harbor threshold definition of "significant continuing business activity." The safe harbor provision states that if a corporation retains a business activity that represented at least 20% of total assets at the end of the most recently completed fiscal year and 20% of income or revenue from continuing operations for that fiscal year, the corporation will conclusively be deemed to have "retained a significant continuing business activity." In such an instance, the disposition does not require a "more than two-thirds" shareholder vote.

The safe harbor provision also provides for an exception to the statutory threshold by use of the language, "unless the articles of incorporation or a shareholder-approved bylaw otherwise provide." Thus, the statute allows a corporation to opt out of the statutory safe harbor threshold.

The plain language of the statute does not support the Corporation's claim that the exception in the safe harbor provision permits a corporation to adopt a bylaw that redefines the meaning of "significant continuing business activity" to be anything that the majority designates it to be. The safe harbor provision simply states a default threshold, and the plain language of the statutory exception to the application of that threshold only allows a corporation to accept or

11

reject that threshold.  There is no statutory language that states or implies that an alternative threshold stated in an article of incorporation or a bylaw should be deemed sufficient to satisfy the "significant continuing business activity" requirement as a matter of law.  Stated differently, the language in the safe harbor provision providing for an exception to the statutory threshold does not give a corporation the authority to amend or create a new threshold that will be deemed sufficient as a matter of law to constitute a "significant continuing business activity."

The statute's context supports this plain meaning interpretation.  Allowing a simple majority of a corporation's shareholders to redefine "significant continuing business activity" would render Code §§ 13.1-724(A) and (E) meaningless.  Such an interpretation would allow a majority of shareholders to approve any disposition without the "more than two-thirds" shareholder approval required by statute by changing its bylaws with a simple majority vote of its shareholders.  If a majority of shareholders could approve of any disposition it desired by merely changing its bylaws to create any whimsical definition of what constitutes a "significant continuing business activity," subsections (A) and (E) would be rendered unnecessary.

Additionally, Code § 13.1-724(E) explicitly permits a corporation to create a lower voting threshold, but only by amending the articles of incorporation.  It is noteworthy that subject to some exceptions, the Act only allows a corporation to amend its articles of incorporation by a vote of "more than two-thirds" of the shareholders.  *See* Code § 13.1-707(D).  Thus, if shareholders want to downgrade a supermajority voting threshold to a simple majority, they must amend the articles of incorporation by that same supermajority.  The circuit court erred in its interpretation of Code § 13.1-724.

The Corporation's alternative argument that it had "more than two-thirds" of shareholder votes because Bill ratified Amendment 1 with his vote for Amendment 2, is unavailing.  First,

12

Code § 13.1-724 requires "more than two-thirds" vote for a *disposition or sale* that leaves a

corporation without a "significant continuing business activity." Thus, whether the Corporation

received "more than two-thirds" vote for Amendments 1 or 2 is irrelevant because such a voting

threshold only applies to the Proposed Sale, which Bill did not vote for. Second, voting to

amend one sentence in a bylaw does not ratify the entire bylaw; it only ratifies the change to that

bylaw voted upon. Bill did not approve of Amendment 1, and Amendment 2 altered only "the

third sentence of Article XII," which does not mention "significant continuing business activity."

Amendment 1 stated a safe harbor threshold different from that approved by the General

Assembly, which is evidence of the Corporation's intent to opt out of the statutory threshold

stated in Code § 13.1-724(A). Even if the Corporation satisfied its arbitrary threshold created by

Amendment 1, satisfaction of that threshold would not necessarily be sufficient to satisfy, as a

matter of law, the "significant continuing business activity" requirement in Code § 13.1-

724(A). The circuit court needed to take evidence to determine whether the Proposed Sale

factually left the Corporation without a "significant continuing business activity." It did not do

so. Thus, the circuit court erred in granting the special plea in bar and entering judgment in favor

of the Corporation.[*]

### Temporary Injunction

In general, a court may not grant injunctive relief unless a party has shown that party

would suffer irreparable harm without the injunction, and that the party has no adequate remedy

at law. *Wright v. Castles*, 232 Va. 218, 224 (1986). Granting or denying a temporary injunction

is a discretionary act arising from a court's equitable powers. *Manchester Cotton Mills v. Town*

---

[*] Given this conclusion, we need not reach the issue of whether fiduciary duties provide substitute protection for minority shareholders.

*of Manchester*, 66 Va. 825, 827 (1875). A temporary injunction allows a court to preserve the status quo between the parties while litigation is ongoing. *Iron City Sav. Bank v. Isaacsen*, 158 Va. 609, 625 (1932). "No temporary injunction shall be awarded unless the court shall be satisfied of the plaintiff's equity." Code § 8.01-628.

When evaluating a circuit court's decision for abuse of discretion, this Court defers to the circuit court's ruling and does not reverse "merely because it would have come to a different result." *Martin v. Lahti*, 295 Va. 77, 88 (2018) (citation and internal quotation marks omitted). The circuit court does not abuse its discretion if the court remains within its "range of choice" and "is not influenced by any mistake of law." *Id.* (citation and internal quotation marks omitted). However, "[a] court abuses its discretion if . . . its action or its decision was based on erroneous legal conclusions." *Oprisko v. Director of the Dep't of Corr.*, 293 Va. 87, 99 (2017). It appears from the record that the ruling of the circuit court denying the temporary injunction was predicated upon its interpretation of Code § 13.1-724 and the application of laches.

Laches is a defense against equitable claims where the plaintiff fails "to assert a known right or claim for an unexplained period of time under circumstances prejudicial to the adverse party." *Stewart v. Lady*, 251 Va. 106, 114 (1996) (citation and internal quotation marks omitted). The party asserting laches carries the burden of proof. *Id*. Although laches is within the circuit court's discretion, this Court "will not approve such finding if the party asserting this defense fails to prove prejudice." *Id*.

In addition, this Court has previously stated:

It is a well recognized rule in equity that laches cannot be applied against those who are ignorant of their rights. They must first know their rights. This defense is only permitted to defeat an acknowledged right on the ground that laches affords evidence that the right has been abandoned.

14

*Meredith v. Goodwyn*, 219 Va. 1025, 1028-29 (1979) (citation and internal quotation marks omitted).

While a court must determine laches based on each case's "particular circumstances," it is "well-established" that "in respect to the statute of limitations equity follows the law." *Belcher v. Kirkwood*, 238 Va. 430, 433 (1989) (citation and internal quotation marks omitted). The statute of limitations for written contracts is five years. Code § 8.01-24; *see also Kappa Sigma Fraternity, Inc. v. Kappa Sigma Fraternity*, 266 Va. 455, 467 (2003) (suggesting that a declaratory judgment challenging corporate amendments is like a breach of written contract claim).

Sarah knew as early as December 2015 that Dick and Dan wanted to sell the Mill Business, and she informed the Corporation only one month later, on January 29, 2016, that Amendment 1 was in violation of Code § 13.1-724. She also expressly warned the Corporation in a letter dated July 18, 2017 that she would take necessary legal action if the Corporation approved the sale. The Corporation approved the Proposed Sale after Sarah filed the complaint in circuit court. Sarah thus never abandoned her claim given her continuous warnings to the Corporation about the purportedly unlawful Proposed Sale. The Corporation was put on notice as early as January 2016 regarding Sarah's opposition to selling the Mill Business, and it could have sought a declaratory judgment concerning its rights, just as easily as Sarah, before it had significantly sought or acquired a buyer.

Although the circuit court properly considered the timing of the filing of the request for a temporary injunction in weighing the equity of granting the injunction, it abused its discretion when it found that laches barred Sarah's request for a temporary injunction. Also, as explained above, the circuit court misinterpreted Code § 13.1-724. To the extent the circuit court based its

ruling regarding the temporary injunction upon laches and its misinterpretation of Code § 13.1-724, it erred in doing so.

CONCLUSION

Because the circuit court erred in its interpretation of Code § 13.1-724 and in finding that laches barred Sarah's motion for a temporary injunction, it erred in granting the plea in bar, denying the temporary injunction, and entering judgment in favor of the Corporation. The judgment of the circuit court sustaining the special plea in bar and denying the temporary injunction is reversed, and this case is remanded to the circuit court for further proceedings consistent with this opinion.

*Reversed and remanded.*